UNITED STATES DISTRICT COURT          SOUTHERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| *versus* | § | CRIMINAL CASE H-98-18 |
| | § | |
| JAMES ANTHUM COLLINS AND YANK BARRY, | § | |
| | § | |
| Defendants. | § | |

## Opinion on Acquittal

*1.*     *Introduction.*

James Anthum Collins was executive director of the Texas Department of Criminal Justice, the agency in charge of the Texas prison system.  Yank Barry is the owner of VitaPro, Inc., the company that makes VitaPro, a soy-based meat alternative.

In August 2001, a jury convicted Collins and Barry of bribery, money-laundering, and conspiracy.  The government had also charged the men with social-security fraud, but the court acquitted them of that count.

The government's theory was that Barry had bribed Collins in two wire transfers of $10,000 each to push a five-year contract with VitaPro through the agency.  It said that Collins established a corporation – Certified Technology Consultants, Inc. – so that Barry could wire – and disguise – the bribes to him.  Last, it said that the men had conspired to commit these crimes.

The government's case was entirely circumstantial.  It presented numerous witnesses from the agency. None testified – or even knew – about a deal of any kind between Collins and Barry.  Their strongest criticism was that Collins really wanted VitaPro in the prisons and was really involved in the project.

The government's documentary evidence was (a) the contracts – agreements that had to pass multiple levels of approval – and (b) two wire transfers from VitaPro's bank account to an account to which Collins had access.

The government also presented evidence of other transactions from Certified Technology's bank account and Collins's personal account.  The government did not, however, show how these transactions related to the charges or why they were illegal. Because these transactions were not included in the indictment, they should have been excluded.

This testimony and these documents were not enough to convict Collins and Barry.  The success of the government's case hung on its star witness, Patrick Graham – a convicted con-artist and a freelance government agent.  At one time, he sold VitaPro. This was before his penchant for fraud caught up with him and he was convicted of stealing $150,000 from the wife of a Texas inmate.

Graham testified that Collins and Barry had told him about their scheme and had even sought his advice on how to execute it.  Graham said that, through his daughter, he helped create Certified Technology by which Collins could receive Barry's bribes.

Aside from Graham's manifold character defects, his testimony here was riddled with contradictions.  In addition, Graham had a secret deal with the United States Attorney for the Eastern District of Louisiana that – in exchange for his testimony in numerous cases – the U.S. Attorney would not prosecute him for his crimes in Louisiana and would even seek a sentence reduction for his crimes in other states.  With this motivation, Graham conveniently knew all sorts of information about nefarious dealings in other districts.

In this case, Graham's testimony of oral, uncorroborated statements was the only inculpatory evidence that the government offered; it had to be substantive to the convictions and believed beyond a reasonable doubt.  Without it, the jury could not have convicted the defendants.  For these reasons, Collins and Barry ask this court to acquit them, arguing that the government did not prove their guilt beyond a reasonable doubt. In the alternative, they argue that the verdict was so contrary to the great weight of evidence that this court should give them a new trial.  They are right.

The court will acquit Collins and Barry.  Conditionally, as a contingent holding, it will give them a new trial.

2.    *Extensions.*

As an initial matter, the government says that Collins and Barry's motion – submitted nearly a year after the verdict – is late and that the court has no authority to consider their request.  It says that a defendant must move for acquittal or a new trial no later than seven days after the verdict or whatever deadline the court sets during that seven-day period.[1]

The jury returned its verdict on August 20, 2001.  Under the rules, their post-verdict papers were due on August 27.  Two days after the verdict, Collins and Barry asked for a one-month extension to file their motions.  The court extended the deadline to September 27.  The government did not object.  Before that extension expired, the defendants moved for another one: they were having trouble getting the trial transcript.  The court extended the deadline to October 16.  The government again offered no objection.

Before the next deadline, the court reporter still had not furnished the transcript.  The defendants asked for an extension before the deadline, the court gave them an extension, and the defendants did not object.  This cycle repeated itself again and again until, ultimately, the court told the defendants that they had twenty-eight days after receiving the transcript to move for post-verdict relief.[2]

The court reporter furnished the transcripts on April 23, 2002.  It turns out that she had suffered a nervous breakdown, affecting this case and others.  Errors in the transcripts were staggering: she had failed to give defense counsel portions of the transcript; she had not transcribed entire portions of the trial; and there were errors in the transcription, many of which were significant.

The chief deputy clerk corrected the transcripts by listening to each trial tape and correcting the transcript line by line.  He did not have tapes for some portions of the trial; about one-third of the transcript remains uncorrected.  Many tapes that he did have were mislabeled.  Of what he was able to review, he found significant errors.  The clerk finished this process on June 27, 2002.

---

[1]Fed. R. Crim. P. 29(c)(1), 33(b)(2).

[2]Dkt. 258.

The court told the defendants to move for acquittal or a new trial by July 22. Barry did.  Collins asks to adopt Barry's motions as his own.  Before July 22, the defendants asked to be able to move for acquittal or a new trial based on the inaccuracy of the transcript.  The court gave them until August 5.  They moved on time.

It is important to note that, at no time, did Barry or Collins fail to meet the court's deadlines.  Before the expiration of each extension, they moved for another one.  When the court told them to move for post-verdict relief, they moved timely.

The government says that the court may give a person more time to move for acquittal or a new trial, but it must set the due date for that motion "during the seven-day period" after the verdict.[3]  Under the government's logic, since the jury returned its verdict on August 20, the court had until August 27 to extend the defendants' time for moving for post-verdict relief.  The court could have extended the deadline to whatever date it wanted; it simply had to do so by August 27.  After then, it had no authority to give another deadline.

By the government's reasoning, then, September 27th – the extension set on August 22 – was the only valid extension.  The government says that motions submitted after this date – even with the court's permission – are untimely and that the court may not entertain them.  The government is wrong.

A.      *Rules.*

The rules were created to ensure a simple procedure, fairness, and expediency. They were also created "to provide for the *just determination* of every criminal proceeding. . . ." (emphasis added)[4]   Justice will not be served if these defendants' convictions remain at all and much less if they remain because the court's reporter became unreliable.

It is not clear what adjudicatory goal the government wishes to accomplish.  It is not expediency: the government's argument recognizes that the court could have set a deadline six months, one year, even five years in the future.  It seems that the only goal

---

[3]Fed. R. Crim. P. 29(c)(1), 33(b)(2).

[4]Fed. R. Crim. P. 2

that the government wants to advance is hyper-technical simplicity that elevates form over substance.  The court has a different view.

    B.    *Discretion.*

To summarize the government's argument: Before August 27, 2001, the court should have ordered the defendants to move for post-verdict relief no later than August 5, 2002 – the last day on which the defendants moved.  Because the court set extensions after August 27 – but always before any extension expired – Collins's and Barry's convictions must stand.

Applying the government's interpretation of the rules, then, assume that, within seven days after the verdict on August 20, 2001, the defendants request and the court sets a deadline of October 1, 2001, for filing post-verdict papers.  That is the only deadline that the court sets within the seven-day period.  Assume also that, around the beginning of September, instead of a court reporter's mental collapse, members of Congress find themselves in rather intractable budgetary debates that they never resolve or another hurricane visits Houston the day before the motions are due.  October 1st arrives, and Collins's and Barry's lawyers go to the court house to file their papers.  The court house, they find, is closed.  The defendants' lawyers cannot file their motions.

As October 1st neared, the court saw that the shutdown or hurricane was possible.  Because it followed a reading of the rules like the one that the government now advocates, it would be unable to extend the deadline – ultimately making the defendants' motions late, stripping the court of the authority to entertain the petitions, and, in the end, making the defendants suffer for circumstances beyond their control.  In addition, if the judge were out of chambers for the whole seven days and could not rule on the motion, the motion for an extension would be moot.  This result is too rigid.  It also contradicts a judge's authority to manage his docket.

The point of this exercise is to illustrate that trial judges are best able to evaluate needs for extensions.[5]  Courts routinely give them for a variety of reasons: a lawyer needs

---

[5]*United States v. DiBernardo*, 880 F.2d 1216, 1224 n.3 (11th Cir. 1989); *United States v. Reinhold*, 20 F.Supp.2d 541, 547–548 (S.D.N.Y. 1998); *United States v. Robinson*, 303 F.Supp.2d 231, 234–235 (N.D.N.Y. 2004).

more time to prepare the pleading; parties have to reschedule a deposition necessary for the pleading; or a lawyer has a conflict in another court or a personal obligation. Sometimes the circumstances necessitating an extension are foreseeable; sometimes – as in this case – they are not.  The purpose of each extension is to ensure that a litigant has the opportunity to represent his interests fully.  When this court saw that the transcript was not forthcoming, out of fairness to the defendants, it gave them more time.

It is not the case that Collins and Barry moved for acquittal or a new trial after extensions expired.[6]  They moved before each deadline.  As the end of each extension approached, the transcript was still not available.[7]  When the court reporter finally produced a transcript, it was filled with errors.[8]

Neither Collins and Barry nor this court could have anticipated her emotional instability.   The government, however, wants the defendants to be clairvoyant. Alternatively, it wants them to suffer for a fault in the court because they are not.

C.      *Necessity.*

Collins and Barry, the government says, knew that they would argue that the evidence was insufficient and that Graham had no credibility.  They did not need the transcripts to raise these arguments.   Since the transcripts were unnecessary, the extensions were, too – making Collins's and Barry's motions time-barred.   The government is wrong.

Collins and Barry could not merely move for relief.  They had to *support* their request.  This required explaining *how* the evidence was insufficient or *how* Graham had contradicted himself.  They needed the transcript for this.  In addition, the court wanted the defendants' "post-verdict papers" – its motions and support – simultaneously. Collins and Barry submitted their materials as the court ordered.

Even if the defendants had moved for relief by August 27, 2002, and later substantiated their motions when an accurate transcript became available, the result

---

[6]*See, e.g.*, *Carlisle v. United States*, 517 U.S. 416 (1996).

[7]*See* dkts. 225, 232, 236, 257, and 273.

[8]Dkts. 286, 291.

would have been no different than the current situation: because of the transcript, the same delay in the court's ability to decide the motions would have existed. The government cannot overcome this argument.

Last, by never objecting to the court's extensions, the government has waived its objections.

3.    *Standard: Acquittal.*

The court may acquit Collins and Barry if the evidence is insufficient to support their conviction.[9] On a motion for acquittal, the court must examine all the evidence but may not re-weigh it.[10] Rather, it must view the evidence in a light most favorable to the verdict. That evaluation must reveal that a manifest injustice would result if the convictions remained and that no rational juror could have found Collins and Barry guilty beyond a reasonable doubt.[11]

4.    *Budget.*

Before Collins became executive director, the Texas legislature authorized the state comptroller to audit agencies and suggest how they could save money. It told the prison system that it needed to create joint ventures with Texas Correctional Industries and use inmates as labor.[12] The agency looked unsuccessfully for companies who were interested in the idea.

In the fall of 1993, Collins received a telephone call from Charlie Terrell, former chairman of the prison board. Collins was director of the institutional division at the time – that is, the prison system. Terrell had referred Azie Taylor Morton to Collins to talk to him about a food product made by a company that she represented. Morton was former United States Treasurer under President Carter. She was now a salesman for VitaPro.

---

[9]Fed. R. Crim. P. 29(a).

[10]Wright, Fed. Practice and Procedure: Criminal 3d § 467 (2000).

[11]*United States of America  v. Rodriguez*, 702 F.2d 38, 41 (2d Cir. 1983).

[12]Depo. of Andy Collins, dkt. 215, tr. at 19.

At the time, the prisons already used soy powder in meat dishes.  This allowed the prison to cut the amount of meat that it used in recipes while still serving the prisoners enough protein.  Use of the powder extended the meat supply and saved money.  The comptroller urged the agency to increase the amount of soy powder that it used.  It reasoned that the amount of powder used would be directly proportional to the amount of money saved.  The problem was that too much powder discolored the meat and ruined the meal.

Morton left Collins with VitaPro samples.  He used them at home in recipes and was impressed.  He arranged for the deputy director of operations, Wayne Scott, and him to attend a demonstration when they were at a conference in Florida.  Collins then tested VitaPro with his staff, who reported favorably.  Collins wanted to test the product at a few of the prison facilities.

5.      *Bidding.*

        A.      *First.*

Collins told Janie Thomas, director of food services, to prepare a solicitation for a bid through the General Services Commission.[13]  General Services is an acquisition agency: it contracts with vendors to procure all supplies, equipment, and services for the state's agencies, including the Texas Department of Criminal Justice.  Collins wanted (a) to buy a large quantity of VitaPro to test and (b) to check the veracity of Barry's statement that no one else made a product like VitaPro.[14]

In mid-April 1994, Thomas submitted the solicitation for the bids.  She had prepared it using a VitaPro nutrition label and information that she had from the company.[15]  It called for a "dehydrated textured vegetable protein product."[16]  Though

---

[13]Depo. of Janie Thomas, dkt. 220, tr. at 82; Collins, dkt. 215, tr. at 25.

[14]Collins, dkt. 215, tr. at 26.

[15]Thomas, tr. at 82.

[16]Ex. 1.

she had relied on the VitaPro label, Thomas said that the specifications were so generic that anybody who made a soy extender could bid.[17]

General Services sent the solicitation to twenty-six vendors.[18]   Only A&M Products and VitaPro responded.[19]   A&M responded with the lowest price, and the commission initially recommended that A&M receive the deal.[20]   A&M's product, however, did not meet the bid specifications: it contained only soy flour and caramel color.  A&M's description said nothing about beef flavor or dehydrated vegetables.  It was ultimately rejected.[21]   VitaPro fit the specifications of the solicitation perfectly, but its price exceeded the estimate by four or five times.  It, too, was rejected.

Thomas testified that she erred when she prepared the solicitation for the bid.[22]  The solicitation was for 20,000 pounds of product – not specifying raw or reconstituted product.  Thomas had based her calculation on the need for 20,000 pounds of *finished* product.  Barry responded with the price for 20,000 pounds of dry, raw product, which – when water was added – would have generated about 100,000 pounds of reconstituted VitaPro.  This explained the high price of the VitaPro bid.

B.       *Second.*

When the agency realized Thomas's mistake, Collins told her to prepare another solicitation.  General Services sent this second one to potential vendors.  Its content was almost identical to the first.[23]   This time, however, the solicitation contained a section where the bidder needed to furnish information on reconstitution.

---

[17]Thomas, tr. at 83.

[18]Ex. 1a; Depo. of Caldwell Prejean, dkt. 276, tr. at 80.

[19]Collins, dkt. 215, tr. at 26; *see also* Prejean, tr. at 80–81.

[20]Ex. 1f.

[21]Ex. 1g.

[22]Thomas, tr. at 100.

[23]*Compare* ex. 1 *with* ex. 2.

Caldwell Prejean, the assistant director of purchasing for the agency, called Yank Barry to make sure that he understood this new section in the second solicitation.[24] Prejean said that this was a conflict of interest.[25]   Although he did not explain, presumably he felt that a telephone call to Barry gave Barry an advantage.  It did not. With the first solicitation, General Services contacted nearly thirty vendors.  No one has suggested that that process was tainted.

The second solicitation went to the same vendors as before.  Because of the first solicitation, the agency knew that the product existed and that only one company – VitaPro – made it.  It simply needed to get the numbers right.  Prejean's call facilitated that.  Prejean did not testify that he asked Barry to skew his price in order to secure the contract; he only explained to Barry the new content of the second solicitation.

Another fact supporting the lack of conflict was that the agency wanted to test VitaPro specifically.  It was not unusual for General Services to tailor a solicitation toward a certain vendor when the agency wanted to try a specific product.[26]   Unsurprisingly, VitaPro was the only bidder to respond.  In June 1994, the commission awarded the contract to it.[27]   This allowed the agency to sample the product.

6.      *Trip.*

The VitaPro product worked well.  Some prisoners did complain, but overall, it was easy to use, prepare, and store.  Consistent with the comptroller's urging that the prison system collaborate with private businesses, Collins began thinking about a joint venture between Correctional Industries and VitaPro.

Collins asked Dub Maedgen to investigate his idea.[28]  Maedgen was a businessman and chairman of the advisory board to Correctional Industries.  In August 1994, Collins,

---

[24]Prejean, tr. at 54.

[25]*Id.* at 82.

[26]Prejean, tr. at 80.

[27]Ex. 2b at 2; ex. 2d.

[28]Collins, dkt. 215, tr. at 29–30.

Maedgen, and Larry Kyle, the director of Correctional Industries, met with Yank Barry and Azie Taylor Morton in Austin to discuss using VitaPro in prison meals and making it a work program of Correctional Industries.[29]  In September 1994, Kyle, Maedgen, and two other prison officials visited the facility in Montreal, Canada, where VitaPro was made.  The other officials were John Gilbert, assistant director for laundry and food services, and Tom Pierce, program administrator for food services.[30]  Collins was not on the trip.

The trip was so successful that, while at the facility, Kyle talked to Barry about Texas prisons being part of the manufacturing or packaging of VitaPro.[31]  Barry hesitated on the manufacturing idea; he would need to have quality-assurance people present, if Texas and VitaPro entered into an agreement.[32]  Regardless, at the very least, Kyle and Maedgen left Canada wanting Correctional Industries to distribute VitaPro to other prisons in the United States.[33]  Pierce and Gilbert wanted to use the product in meals.[34]

On October 18, 1994, Pierce sent a memorandum to Kyle about his impressions of the trip.[35]  He said that the dishes that they sampled were "more than acceptable."  He also found that, compared to the agency's beef prices, use of VitaPro would save the state money.  Additionally, because VitaPro did not require refrigeration, it would be cheaper to transport and store than meat.  Since it needed only water to reconstitute it, it was easy to prepare.  He recommended using VitaPro in casseroles along with beef or chicken.

---

[29]Depo. of Larry Kyle, dkt. 220, tr. at 131.

[30]Depo. of Tom Pierce, dkt. 220, tr. at 69.

[31]Pierce, tr. at 70.

[32]Id.

[33]Id. at 71; Kyle, tr. at 170; Depo. of Robert Maedgen, dkt. 281, tr. at 85.

[34]Pierce, tr. at 71.

[35]Ex. 31.

7.     *First Contract.*

When the men returned, no contract existed to purchase VitaPro for prisons' use.[36]  The agency wanted to order the product through Correctional Industries, who would sell the product to the agency, as it did all the products that it sold.  Correctional Industries also wanted to sell VitaPro to prisons throughout the country.

On October 24, Jack Crimm, assistant planner for Correctional Industries, wrote Prejean and Kyle, telling them that it would be "economically feasible and advantageous" for the agency to buy VitaPro and sell it through Correctional Industries.[37]  He urged that the agency "proceed with alacrity" so that they could be a national distributor of the product.[38]  Crimm worked with Barry on finalizing the deal.[39]

On November 7, officials submitted a decision memorandum to Collins.[40]  These were:  Kyle; Prejean; David McNutt, the  assistant director for the budget; and William McCray, deputy director for administrative services.   The memorandum officially proposed the plan for Correctional Industries to buy VitaPro to sell to the agency and to others.  Collins approved it.

The agency ordered about $7 million of VitaPro from November 10, 1994, through August 31, 1999.[41]  The agency had the option to renew the contract annually based on VitaPro's performance and the state's satisfaction.  Like all state contracts, this one gave the agency the right to cancel if the legislature appropriated no funds.

In early July, VitaPro expressed the desire to renew the contract for September 1, 1995, through August 31, 1996.[42]  In late July, VitaPro asked the agency if it would enter

---

[36]Pierce, tr. at 71.

[37]Ex. 40 at 2.

[38]*Id.*

[39]Exs. 45,  46.

[40]Ex. 3.

[41]Ex. 3a.

[42]Exs. 4b, 4c.

into a five-year agreement instead of a one-year deal with four options to renew.[43]  In exchange, Correctional Industries would save $21,000 each year.  Crimm asked Prejean to look at VitaPro's amended contract and see if the agency could enter into the deal.

8.    *Louisiana.*

In the spring of 1995, Patrick Graham called Collins about a private prison that a company wanted to build in Louisiana.  Graham told Collins that he was a consultant for the project.  Graham was actually one of the partners.  Graham wanted the names of private-prison management companies.[44]  About two months later, Graham asked Collins if he would look at construction plans for the facility.  Collins said yes.  Months later, Graham asked Collins to look at the operational plans.  Collins agreed.  At no time did he receive pay from Graham for his advice.[45]

At the end of May, Collins talked to Fred Hofheinz, former mayor of Houston and a partner in the Louisiana venture.  Hofheinz owned Viewpoint, the company that got the contract from the state of Louisiana to build and operate the facility.  He and Graham were apparently having trouble finding an operator for it.  This was impairing their ability to raise funds.[46]

Hofheinz asked Collins if he would be interested in operating the prison in the future.  Collins looked at the plans more closely and talked to Louisiana's director of corrections to make sure that the prison plan was legitimate.[47]  At the time, Hofheinz and Graham had secured no financing for the facility but were working on it.  They told Collins that it would take a little over two years to complete the prison after they got the money.[48]  The timing was perfect for Collins:  he wanted to work for the state of Texas

---

[43]Ex. 41.

[44]Collins, dkt. 215, tr. at 41; Depo. of Patrick Graham, dkt. 178, at 11.

[45]Collins, dkt. 215 at 44.

[46]Graham, dkt. 178, tr. at 15.

[47]Collins, dkt. 215, tr. at 45.

[48]*Id.* at 46.

for twenty-five years before he retired, and the Louisiana prison would be finished around that time.  Collins agreed to manage the prison when he retired from the Texas agency.

Viewpoint and Collins then formed Professional Care of America.  Professional Care was advertised as the management company for the prison.  Viewpoint would own sixty percent of the company; Collins would own forty percent.[49]   None of the transactions of Collins in connection with the Louisiana prison is the subject – directly or indirectly – of the indictment here.

9.     *Retirement.*

In early September 1995, Viewpoint sent a bond prospectus to Governor George Bush's office; it wanted Texas to invest in the project.  The prospectus attributed Professional Care to Collins.[50]   The governor questioned Collins's agreement as an interference with his duties to the agency.  On September 8, he told Allen Polunsky, the chairman of the Texas Board of Criminal Justice, to talk to Collins.[51]

That day, Polunsky called Collins, who was in Montreal, Canada, visiting the VitaPro facility.[52]   Collins had been in New York City on a vacation and had never been to the VitaPro plant or Montreal.  He called Barry and arranged for a tour.  Fifteen minutes after Barry picked him up at the airport, Collins received a telephone call on his cellular telephone.  The person on the other end – Polunksy – was screaming.[53]

Collins told Polunsky that Professional Care was his company but that his involvement in the venture was only speculative at that point.[54]   He saw no conflict because no facility existed for him to operate.

---

[49]Graham, dkt. 178, tr. at 13.

[50]Polunsky, dkt. 275, at 101–102.

[51]*Id.* at 101.

[52]*Id.*

[53]Barry, dkt. 216, tr. at 120.

[54]*Id.* at 103.

After the conversation ended, Collins told Barry that his job might be "toast" and that the governor was upset.  Barry told Collins that if the state fired him, VitaPro would hire him.[55]  This was consistent with VitaPro's practice of hiring people who had been in public service.  Because VitaPro caters to institutional clients – schools, prisons, and hospitals, for example – it hires salespeople who were familiar with those institutions.

Collins left Montreal the next morning.  On September 10, Collins met with Polunsky and John Ward, another board member.  They told Collins that his deal was improper and that they could no longer support him as executive director.[56]  Collins had two choices: resign or be fired.  He had to decide by the board meeting that was scheduled for a few days later.[57]  A day or two before that meeting, Collins told Polunsky that he would resign.  At the meeting on September 14, Collins announced his retirement.[58]

The press reported Collins's announcement immediately.[59]  It also said that the board wanted to pick Collins's successor by the end of October.[60]

Collins called Fred Hofheinz to tell him what had happened.  Hofheinz and Graham decided that Collins could start working on the Louisiana project on January 1, 1996.  Collins would work for Viewpoint as a consultant, not an employee.[61]

Collins also called Barry to see if he could consult for VitaPro when he retired.[62]  Collins told Barry that his last day with the agency would be November 30, 1995, as

---

[55]Barry, dkt. 216, tr. at 121.

[56]*Id.* at 108.

[57]*Id.* at 109.

[58]*Id.* at 110.

[59]*See, e.g., State criminal justice director leaving; 23-year veteran has private business offer*, HOUSTON CHRON., Sept. 15, 1995, at A-33.

[60]*See, e.g., 10 seek crime post,* HOUSTON CHRON., Oct. 3, 1995, at A-17.

[61]Collins, dkt. 215, tr. at 50.

[62]Barry, dkt. 216, at 123.

Collins and Polunksy had agreed.[63]  Collins later asked Polunksy if he could work until the end of December so that he could vest into a higher-level retirement.  Polunsky agreed.[64]

Weeks later, the board selected Wayne Scott to succeed Collins.  Officially, Scott's first day as executive director was January 1, 1996.  In practice, he assumed the duties of the job on the day that he was designated – October 24.[65]  Scott even took over the executive director's parking spot, and he occupied the director's office starting in early December.[66]

Starting October 24, Scott made the decisions.  Collins rarely did.[67]  Scott and Polunsky testified that Collins was absent from the office a great deal because (a) he had accrued a lot of vacation time and (b) he was looking for work when he retired from the prison system.[68]  Although he had arranged to work for Viewpoint, he wanted to make sure that he had explored other opportunities, in case the Louisiana project did not happen.[69]

Collins continued to work on his future plans with VitaPro.  Barry knew that Collins wanted to consult for several companies.  Collins checked with state ethics officers to inquire about working for Barry and what the limits of that job would be.  He was told that he could work on deals only outside of Texas.[70]

Barry agreed to pay Collins $1,000 for each day that he worked.  VitaPro would pay his expenses, too.  In addition, Collins was to receive a $10,000 advance, which was

---

[63]Barry, dkt. 216, tr. at 124; Polunsky, dkt. 275, tr. at 111; Collins, dkt. 216, at 39; Scott, dkt. 220, at 20.

[64]Polunsky, tr. at 110-111; Collins, dkt. 216, tr. at 39.

[65]Scott, tr. at 21; Polunsky, tr. at 146.

[66]Collins, dkt. 215, tr. at 82.

[67]Polunsky, tr. at 146.

[68]Scott, tr. at 19; Polunksy, tr. at 116, 147.

[69]Collins, dkt. 215, tr. at 52.

[70]Depo. of Oliver B. Revell, dkt. 279, tr. at 14.

routine for VitaPro consultants.[71]  Collins wanted to use the advance to buy a home.[72] When he retired, he would have to leave the one that the state had furnished him.

10.      *Second Contract.*

When Collins returned from Montreal, the amended contract between VitaPro and the Texas prison was not yet finalized.  On September 12 – two days before he announced his retirement –  Collins ordered his staff to get it done.  That day, the agency finalized the five-year deal with VitaPro.  The contract said that the agency would buy about $34 million of VitaPro through August 31, 2000, counting all that had been bought after July 25, 1995.[73]

At trial, the government sought to prove that Collins abandoned his duties to the state – in favor of his own interest – based on the second contract's terms.  It represented that the contract  was favorable to VitaPro but harmful to the state.  This is untrue.  Like the first contract, the second gave the state the option to renew based on VitaPro's performance or the state's satisfaction and the right to cancel if the legislature did not give the agency the funds.  The second contract had the additional protection that the state could cancel "for cause."[74] The contract defined "for cause" as interfering with the prisons' operations.  Both Kyle and Barry testified that it was Collins who insisted on this provision.[75]  Barry's lawyers tried to remove that language from the contract, but Collins would not budge.[76]

The second contract was also different because it added the burger-style mix to the agency's order.  The mix was critical to the agency's sales to other prisons.[77]  The

---

[71]Barry, dkt. 216, tr. at 125.

[72]Barry, dkt. 217, tr. at 5–6.

[73]Ex. 5a.

[74]*Compare* ex. 3a *with* 5a.

[75]Barry, dkt. 216, tr. 110; Kyle, dkt. 220, at 142, 160–161.

[76]Barry, dkt. 216, tr. at 109–110.

[77]Ex. 44.

agency would also pay a lower price on the beef- and chicken-flavored product if it bought the mix.[78]

VitaPro designed a special container so that Correctional Industries could distribute the product with more ease.  In addition, at the food-service director's request, VitaPro changed the formulation of the product so that lactose-intolerant prisoners could consume it.[79]

Under the second contract, the state was obliged to buy a minimum of 2,340 metric tons over the five years at a cost of $17 million, or about $3 million each year. This was about what the first contract anticipated and amounted to roughly 3% of the food-service budget in 1995.[80]  Subject, of course, to its option to quit the deal each year.

11.    *Involvement.*

William McCray, David McNutt, Caldwell Prejean, and Larry Kyle signed the decision memorandum dated September 12th.  This was the document that gave the agency the authority to enter into the new deal.  McCray – not Collins – approved the contract.

At trial, the government made much of the fact that Collins's name at the top of the memorandum had been covered up, as if Collins was hiding his involvement in the deal.[81]  With Collins's name gone, McCray's name was at the top of the list of decision makers, showing that he approved the deal.

David McNutt testified that it was McCray's assistant who deleted Collins's name – not Collins's assistant and not Collins.[82]  Collins was not in the office when the deal was signed.  McCray's assistant erased Collins's name to reflect that McCray was the highest ranking officer who approved the memorandum.

---

[78]Ex. 5.

[79]Collins, dkt. 215, tr. at 36.

[80]Depo. of David McNutt, dkt. 220, tr. at 60.

[81]*See, e.g.,* Prejean, tr. at 74.

[82]McNutt, dkt. 220, tr. at 53.

In addition, when Collins became executive director, he delegated his authority to bind the state to McCray.[83]  Even if Collins had wanted to sign the contract, he could not have done so.  McCray alone had the authority.  Collins only approved requests to enter into contracts; he did not sign the contracts themselves.

The government also made much of the fact that the agency finalized the deal only when Collins returned from Montreal but before he announced his resignation.  It depicted Collins as vehement about getting the deal done that day.[84]  Under Collins's orders, Kyle directed Crimm to walk from office to office, getting the decision makers' signatures on the contract that day – something that had never happened in the agency before.[85]  Prejean and Kyle each testified that they had never known Collins to be so involved in a food contract.[86]

Prejean and Kyle had also never known Collins when he was about to retire.  By the time Collins returned from Montreal, the deal had been virtually untouched for six weeks.  More problematic, the 1996 fiscal year had begun two weeks earlier. The contract should have been completed well before then.  The agency did not now have the luxury of taking its "own sweet time" to finalize the second deal as it had the first.[87]

That Collins was enthusiastic about VitaPro was no secret.  From the start, he eagerly discussed VitaPro with board members and told them what a good deal it would be for the agency.[88]  In addition, Collins was directly accountable to the board for the budget, and he faced constant budgetary pressures.[89]  He had apparently found a product that would help.

---

[83]Collins, dkt. 215, tr. at 83.

[84]*See, e.g.,* Kyle, tr. at 148–149.

[85]Crimm, dkt. 276, tr. at 20.

[86]Prejean, tr. at 76; Kyle, tr. at 133–134, 151; *see also* Thomas, tr. at 90–92.

[87]Crimm, tr. at 20.

[88]Polunsky, tr. at 136–137.

[89]Scott, tr. at 29.

Some staff members said that Collins was unusually involved in the VitaPro contract and strongly advocated its use in the prisons.[90]  Wayne Scott, however, testified that it was not unusual for Collins – or even Scott as executive director – to work directly with the staff on projects in which they were especially interested.[91]  Scott described Collins was as a "hands-on" manager: whenever Collins got involved in a project, he "made a point" of doing it successfully.[92]  It was reasonable, therefore, that Collins would have wanted to finalize a deal that he had worked on for the entirety of his tenure as executive director.  After all, he was, in the words of Allen Polunksy, "the finest criminal justice administrator in the United States."[93]

12.    *Certified Technology Consultants.*

A.    *Incorporation.*

Graham resurfaced again to "help" Collins form his post-retirement plans. Graham knew that when Collins retired he was going to be a consultant.  Collins would consult only on projects outside of Texas to avoid ethical conflicts.[94]

Collins would not be on the payroll of companies for whom he worked.  Graham suggested that Collins let Graham's daughter – Lori Lero – establish a corporation on Collins's behalf through which Collins could receive payment for his consulting work. Lero would run it out of her office, prepare and file its tax returns, keep track of the records, and pay Collins's salary through it.  If Collins hired other consultants, they, too, would be paid through the company.

Transactions that occurred through the corporation's bank account formed the foundation of the government's case.

---

[90]*See, e.g.*, Thomas, dkt. 220, tr. at 90–92.

[91]Scott, tr. at 32.

[92]*Id.* at 33.

[93]Clay Robison, *State criminal justice director leaving; 23-year veteran has private business offer*, HOUSTON CHRON., at A-33 (Sept. 15, 1995).

[94]Collins, dkt. 216, tr. at 4; Barry, dkt. 216, tr. at 124–125; Revell, dkt. 279, tr. at 13–14.

On November 13, 1995 – while Collins was still with the Texas agency – Lero incorporated the company. The company was called Certified Technology Consultants.[95] Lero was the registered agent.[96] Collins's name appears nowhere in the articles of incorporation. On November 22, Lero applied for an employer identification number so that the corporation could open a bank account.[97] On the application, she listed herself as the president of the company and its principal officer.[98] Collins's name appears nowhere on the application. The next day, Lero opened the bank account; hers was the only authorized signature. Around that time, Graham's *wife* opened a post office box for Collins.[99]

- Graham swore that, before Certified Technology was formed, Collins went to see Lero to tell her what he wanted.[100] Graham said that he was there, too.[101] He says that, after that meeting, Lero incorporated the company.

- Later, however, Graham swore that Collins did not go with him to see Lero. He went alone.[102]

- Minutes later, the story changed again: Collins called Lero, and she formed the corporation only after talking to Collins.[103]

This information addresses Collins's knowledge about when he knew the corporation was operating.

---

[95]Ex. 63.

[96]Ex. 62.

[97]Lero, dkt. 278, tr. at 11.

[98]Ex. 63.

[99]Ex. 61.

[100]Graham, dkt. 178, tr. at 27.

[101]*Id.* at 28.

[102]Graham, dkt. 214, tr. at 28.

[103]*Id.* at 30.

Collins and Lero had a meeting on December 7.  Lero swore that this was the first corporate meeting.  Lero furnished the court with undated notes that she says that she took during the meeting.  There, Collins asked her to prepare invoices for his work in Louisiana for Viewpoint.  That day, Lero added Collins to the bank account as an authorized person.  Collins asked her to maintain his books and his checkbook for him.[104]  After that meeting, Certified Technology could do business.  Lero acknowledged this at trial.[105]

Lero did a lousy job.  She kept no payroll or corporate records and no minutes.  She filed no tax return for the company and relied only on bank statements for bookkeeping.[106]  The corporation went out of business because "it" did not pay its franchise tax.[107]  In other words, Lero did not pay the tax.

B.    *Mail.*

Graham said that Collins asked for Graham's help in getting a post office box in Kingwood since Collins would be moving there shortly.[108]  Collins says that he never asked for Graham's help.[109]  He testified, in fact, that he never received a key to the box and did not learn of its existence until discovery in this case began.  Graham never disputed this.

Graham's wife opened the post office box in late November.[110]  Collins, however, did not buy his home in Kingwood until mid-December.[111]  Graham did not explain: (a) why Collins needed a mailbox in a neighborhood that was about 65 miles from where he

[104]Ex. 64; Ex. 68.

[105]Lero, dkt. 278, tr. at 13.

[106]*Id.* at 19–20.

[107]*Id.* at 20.

[108]Graham, dkt. 178, tr. at 29.

[109]Collins, dkt. 215, tr. at 59.

[110]Ex. 61.

[111]Ex. 76.

was currently living – and receiving mail – at the time that Graham's wife opened the post office box; (b) why, if Collins was going to live in Kingwood, he could not get is mail at home; or (c) why he did not tell Collins about the box.

Graham was also not able to explain why, on the application, he is listed as an officer of Certified Technology.[112]  He was not a stockholder, officer, or employee of the corporation.[113]  Graham said that he gave his wife the address of the home that Collins was going to buy as the address that she needed to put on the application.[114]  He could not explain why the one on the application is the home of *Graham* and his wife.

C.    *Invoices.*

Lero testified that she prepared three invoices for the corporation.  These were: an invoice dated November 21 for $10,000 to VitaPro; an invoice dated December 15 for $1,600 to Safeguards Technology; and an invoice dated January 10 for $20,000 to VitaPro.[115]  Later, she insisted – under oath – that she prepared only the January invoice.[116]

Lero said that she did not remember if Collins told her basic information, like to whom to send the invoices or for what amount to make them.[117]  At trial, she said that she knew only that the invoices were for services in other states, not that they were for future services.  This directly contradicts her grand-jury testimony in which she said that the invoices were for services "*to be rendered* in Louisiana." (emphasis added)[118]

It is interesting to note that Lero prepared an invoice in November, even though – as she conceded – Certified Technology could not do business in the state since it had

---

[112]Graham, dkt. 214, tr. at 29–30; Graham, dkt. 179, tr. at 14.

[113]Graham, dkt. 214, tr. at 29–30.

[114]*Id.* at 28.

[115]Lero, dkt. 278, at 31–32; Exs. 65, 66, 59.

[116]Lero, dkt. 278, at 37, 38.

[117]*Id.* at 38.

[118]*Id.* at 39.

not had a corporate meeting.  Lero was adamant that Collins directed her to prepare all three invoices.[119]  Collins disagrees with this.  He says that he instructed her to prepare only the January invoice.

Graham, however, testified that it was he who instructed Lero to prepare the invoices.[120]  Graham said that he told his daughter – on behalf of Collins –  to prepare one invoice in November to VitaPro for $10,000 and one in December for $10,000 also to VitaPro.[121]  He then said that Barry told him that he wanted an invoice for $20,000 prepared for January 1996 so that no evidence of his improper dealings with Collins would exist.[122]  He said that Barry told him to tell Lero to destroy the old invoices.[123] Graham said that his daughter prepared the January invoice but destroyed none of the old ones.[124]

Despite his saying that he remembered the invoices, Graham never actually *saw* the invoices.[125]  He said that agents showed him two of them during his debriefing and that he remembered talking about the January invoice with an agent.[126]  He swore that there was a second invoice for $10,000 in the fall because of the wire transfers on December 7th and 8th.   He said that he knew that "that is the case now."[127]  That is, he knew nothing, but having been shown the wire transfers, he made up a story for them.

The government's exhibits contradict Graham's version of the facts, and Graham's testimony contradicts his daughter's.  The record shows three invoices: one in November

---

[119]Lero, Tr. at 16–17, 36.

[120]Graham, dkt. 178, tr. at 30.

[121]Graham, dbt. 179, tr. at 36-37.

[122]*Id.* at 32, 34.

[123]*Id.* at 32-33.

[124]*Id.* at 33.

[125]Graham, dkt. 178, tr. at 31; Graham dkt. 179, at 36.

[126]*Id.*

[127]*Id.* at 37.

for $10,000 to VitaPro, one in December for $1,600 to Safeguard Technology, and one in January for $20,000 to VitaPro.[128]  Graham, however, said that his daughter prepared November, December, and January invoices for VitaPro and that she destroyed none of them.  If it existed, the December invoice should have been produced.  There is no third VitaPro invoice.

Collins testified that he did not learn that the corporation was operating until he received a telephone call from Barry's bookkeeper on January 6.[129]  VitaPro had received the November invoice that Lero had prepared.  On December 7, it directed its bank to wire $10,000 to Certified Technology's bank account to pay it.  Barry and Collins had actually intended that the wire be Collins's advance.  On December 8, the bank sent another $10,000 to Certified Technology's account by mistake.

VitaPro audits its books at the end of each year.  Invoices received must match payments made.  Because of the bank's error, the auditors could not complete their review.[130]  This was when Barry's bookkeeper called Collins.  In addition to learning that the corporation had been operating, Collins learned that an extra $10,000 was in his account.

Barry needed to close his books for the year.  He looked at Collins's schedule for January and saw that Collins would work fourteen or fifteen days that month.  That amounted to $14,000 to $15,000 plus expenses.  Barry asked Collins to send him an invoice for $20,000 for January.  The auditors would record $10,000 as his advance in December 1995 and $10,000 as an expenditure for the work that Collins would do in January.[131]  At trial, Collins testified that the invoice would reflect services that he would perform in January and February.[132]  An invoice for services to be performed is an

---

[128]Exs. 59, 65, 66.

[129]Collins, dkt. 215, tr. at 54; Barry, dkt. 217, tr. at 6.

[130]Barry, dkt. 217, tr. at 6.

[131]Barry, dkt. 217, tr. at 8.

[132]Collins, dkt. 215, tr. at 59.

advance.  It speaks only to VitaPro's balancing its accounts.  It says nothing about an illegal purpose or intent in sending or receiving money.

Collins directed Lero to send the January invoice to correct her earlier work.[133] He had no idea that Lero had sent the November invoice at her father's behest.

13.    *Bank.*

A.      *Deposits.*

The only deposits into Certified Technology's bank account were the two $10,000 transfers from VitaPro's bank and a check from Safeguards Technology for $1,600.[134] These happened in December.

It took VitaPro's bank five weeks to investigate the second transfer.  In early March, the bank wrote Barry an apology for its error.[135]

Graham testified that Barry wired $10,000 in late November and $10,000 in early December.[136]  The record contradicts him.

B.      *Withdrawals.*

On December 11, Lero paid herself $1,500.[137]  This was for her incorporating the company and agreeing to keep its records.  Certified Technology – if it still existed – would deserve a refund.

Lero next wrote a check to her dad for $1,600 to reimburse him for "expenses."[138] Lero did not articulate the nature of these expenses.[139]  She never asked her father for

---

[133]Collins, dkt. 215, tr. at 57.

[134]Ex. 70.

[135]Ex. 73, Letter dated Mar. 1, 1996.

[136]Graham, dkt. 178, tr. at 32.

[137]Ex. 70.

[138]*Id.*

[139]Lero, Tr. at 33-34.

support; she "didn't ask any questions."[140]  She said that she had no idea what services her dad had performed for the corporation.[141]

On cross-examination, Graham first said that he and Collins cashed Safeguard Technology's check so that they could take the money to Louisiana to bribe a prison official.[142]  Later, Graham said that the $1,600 came to him for work that he had done for Safeguard.[143]  Graham was not an employee or officer of Certified Technology Consultants.  It is curious why his daughter was using Collins's company to pay him.

Collins received no money from the account until *January* 1996.[144]  On January 2, he wrote a check to Guaranty Federal Bank for $6,000.[145]  He wrote another check to Guaranty on January 26 for the same amount.[146]  On January 31, Collins wrote a check to American Express for $6,000.[147]  This covered traveling expenses that he had incurred while consulting for VitaPro.

On direct, Graham said that he knew that Collins had access to the account in 1995 because Collins had "told" him that he paid his American Express bill after the wire on December 8th.[148]  Once again, Graham's testimony contradicts the record.  The record shows that Collins took no money out of the account until January 1996, when he had stopped working for the agency.  This includes payments to American Express.

---

[140]*Id.* at 33.

[141]*Id.*

[142]Ex. 70; Graham, dkt. 179, tr. at 20.

[143]Graham, dkt. 179, tr. at 34.

[144]Lero, Tr. at 48; exs. 69, 70.

[145]Ex. 71.

[146]*Id.*

[147]Ex. 72.

[148]Graham, dkt. 178, tr. at 30-31.

14.    *Rescission.*

Patrick Graham was arrested in January 1996 for stealing $150,000.  Police found a VitaPro card on him.[149]   Graham had been selling the product in Louisiana – apparently legitimately.  The media publicized the arrest and the VitaPro card.  Scott called Barry to tell him that the agency was going to cancel the contract.[150]

Before Graham's arrest, the agency had already received complaints about the prisons' use of VitaPro.  These complaints came mostly from the beef industry.  The industry was depressed and was displeased with the agency's use and vocal public endorsement of the competing product.[151]

The state owed VitaPro about $500,000 for product that the agency had consumed.  Barry wanted his money, and he wanted the state to honor its agreement.  Barry sued and prevailed on appeal.  The state moved for a rehearing.  Around this time, Polunsky called Barry and told him, "Drop the civil case, or your troubles are going to start."[152]   The government indicted Collins and Barry two weeks later.

15.    *End.*

Collins stopped using the corporation when Graham was arrested.  This avoided Graham, but Collins continued to work with Barry.   Instead of using Certified Technology, he directly invoiced Barry for his work, and Barry sent him a check.  By March, the publicity about VitaPro was so bad that Barry lost most of his accounts with prisons.  He, therefore, terminated his relationship with Collins.[153]

---

[149]Ex. 58.

[150]Barry, dkt. 217, tr. at 16.

[151]Polunsky, dkt. 275, tr. at 126–127; Thomas, dkt. 220, tr. at 122.

[152]Barry, dkt. 217, tr. at 19.

[153]Collins, dkt. 215, tr. at 60.

16.    *Graham.*

Patrick Graham is a thief and a tax evader.  He was the government's key witness in this case.

In May 1995, this court signed a $35,000,000 civil-fraud judgment against Graham.[154]  He had raised funds from various institutional investors to build prisons in Texas.  These would be for-profit prisons.  They were speculative:  no contracts were in place for their use.  The prisons did not meet Texas standards for prison construction and could not be sold.   Graham, therefore, defaulted on interest payments to the bondholders, and the investors sued.  Graham got $2,000,000 from the deal.  He failed to pay taxes totaling $700,000.  He would later be convicted for this, too.

In January 1996, Graham was arrested for stealing $150,000 from a Texas inmate's wife.  Graham had told her that he was an official at the prison, that Collins was corrupt, and that Graham and he would take bribes in exchange for helping her husband escape.  He also said that other officials, like Wayne Scott, were in on the plan. Graham knew that these were lies.[155]  He was later convicted of first-degree theft and sentenced to ten years in prison.

17.    *Deal.*

Graham did not want to stay in Texas custody for his criminal conviction; he said that he "was not real pleased with it."[156]   Graham contacted the United States Attorney for the Eastern District of Louisiana to make a deal.  He offered to tell the government about his crimes and those of others in exchange for (a) custody in a federal prison in Louisiana and (b) immunity from prosecution for federal crimes involving Louisiana public officials in that state.  Ultimately, Graham wanted to get into the witness

---

[154]*Apex Municipal Fund, Inc., et al. v. N-Group Securities, Inc., et al.,* Civil Action H-92-546.

[155]Graham, dkt. 179, tr. at 51.

[156]*See, e.g.,* Mary Lee Grant, *Informant says he didn't steal FBI money nor was he given special treatment in prison,* Associated Press (Sept. 20, 2000).

protection program.[157]  At the time of trial, Jim Letten was working on that for him.[158]
Then, Letten was the First Assistant United States Attorney for the Eastern District of
Louisiana.  He is now the United States Attorney for that district.

Agents came from everywhere to talk to Graham.  Some wanted to talk about
Safeguard Technology, some wanted to talk about VitaPro, and some wanted to talk
about other transactions.  Graham changed his story to fit their needs.[159]  For example,
during Graham's first debriefing in June 1996, he told agents that Certified Technology
was established primarily for doing business with Safeguard Technology.[160]  He later told
the grand jury in this case that the corporation's primary purpose was doing business
with VitaPro.[161]

Graham's assistance to the government seems to have benefitted him.  The court
learned that Graham spent less than three months in a Texas prison for his Texas
conviction; he was taken to federal prison in Louisiana to serve his time there.  In
addition, by the time of the trial in this court, the government had placed no lien on
Graham's house for his failure to pay over a $1,000,000 in taxes and penalties.

In this district, Letten arranged for Graham to be charged with only a *misdemeanor*
for his tax evasion of nearly $1,000,000.  The government asked that he receive only
probation – no imprisonment.[162]   Graham was sentenced to three months in prison.
Letten has also not prosecuted Graham for his fraud involving one of Graham's
companies, Evergreen Global Resources.

Last, from 1997 until at least the time of trial, Graham had received $1.2 million
in loans from companies that he controlled.  The companies had no officers, and their

---

[157]Graham, dkt. 179, at 75.

[158]*Id.*

[159]*Id.* at 24–25.

[160]*Id.* at 24.

[161]*Id.* at 26-27.

[162]*United States v. Patrick Graham*, Criminal Action H-98-51, dkt. 33, Govt.'s Mot.
for Down. Depart.; Patrick Graham's Sent. Memo., dkt. 42, at 2.

only board member was Lutex Trust, a trust for which Lori Lero was the trustee.  Graham signed no promissory notes, and he reported less than one-twelfth of it as income.[163]  The government has done nothing in response.

The court learned that the government – Letten – had made an oral immunity deal with Graham; immunity deals are usually in writing.  The court ordered the government to disclose fully the deals that it had struck with Graham.[164]  While other agencies were forthcoming, Letten resisted.  He wanted to keep his deal with Graham secret.[165]  In December 1999, Letten told the prosecutor in Houston that he was not at all intervening in Graham's Texas state prosecution to ask the judge for leniency; he only told that judge about Graham's cooperation solely for the purpose of informing him.[166]  Letten rejected the idea that this was "any type of signal" that Graham should receive a reduced sentence. The facts are otherwise.

Three months after his letter to the prosecutor, Letten wrote the judge in that case and asked for a continuance of Graham's sentencing so that he could be present to tell the court how Graham had assisted the federal government.  He did this out of his "legal and moral obligations *to Mr. Graham.*"[167]  (emphasis added)  Letten wanted the judge to give Graham probation for his first-degree felony, but the judge gave Graham ten years in prison.[168]  Ultimately, Graham received parole extraordinarily early from his prison sentence in Texas.  The Federal Bureau of Investigation in New Orleans said that it did not help Graham with his release.  Technically, it was correct.  A retired F.B.I. agent from that division, however, *did* write a letter to the Texas parole board.  Presumably, he acquired information on Graham through his professional, not personal, experience with him.

---

[163]Lero, dkt. 278, tr. at 44–46; Graham, dkt. 214, tr. at 19-20.

[164]Dkt. 82.

[165]Graham, dkt. 179, tr. at 64.

[166]Govt.'s Resp., dkt. 88, Letter from Jim Letter, at para. 4.

[167]Dkt. 105.

[168]Graham, dkt. 214, tr. at 12.

On the tax-fraud case in this court, Letten not only influenced the United States Attorney's recommendations, but he also wrote the judge in that case to affect Graham's sentence.[169]   It is clear that Letten's efforts worked since the judge took into account Graham's "significant level of cooperation" to "the U.S. Attorney's offices in two districts."[170]

Despite his colleague's inability to shoot straight, the prosecutor in this case immediately disclosed to the court Letten's lack of candor and intervention with the Texas state court.  When the court confronted Letten, he calmly said that his appearing in person in state court on behalf of Graham to ask for mercy was not a favor.  Gary Cobe prosecuted this case.  While the court has a view of the record that may differ from his, the court has no criticism of his work at all.

18.    *"Knowledge."*

    A.    *Bribery.*

Graham testified:  "I was told point blank that those payments were directly for the work that Andy had done in pushing through the multiple year contract for VitaPro."[171] Graham did not say what he personally knew, only what he had been told. He did not say if it was Barry who told him about the payments or government agents with whom he spent numerous debriefings.

He said that Barry was paying Collins "ten large" each month.[172]  He testified that he knew that Barry wired one payment in November 1995 and the other in December 1995.[173]  The record contradicts him.

---

[169]*United States v. Patrick Graham*, Criminal Action H-98-51, dkt. 33; Sent. Tr., dkt. 46, tr. at 15–16, 20.

[170]Tr. at 20.

[171]Graham, dkt. 178, tr. at 22.

[172]*Id.* at 21.

[173]*Id.* at 32.

Graham said that Barry paid Collins for pushing the contract through the agency in October, November, and December.[174]  When reminded that the agency finalized the contract on September 12, 1995, Graham said that, well, Collins was babysitting the project those months.[175]  When challenged on how a person babysits a project, Graham said that Collins was pressuring Janie Thomas to keep using VitaPro.

Despite her testimony that Collins pressured her to use VitaPro in the initial months of the prisons' use of it, Thomas never testified that Collins pressured her in the last months of his tenure.  In addition, Scott said nothing about Collins's pressuring Thomas in October, November, or December.  He, in fact, said that Collins had very little involvement with the agency after the board designated Scott in October.

   B.   *Meetings.*

Graham told the grand jury that Barry told him that he was bribing Collins at the first meeting.[176]  At trial, Graham testified that, in one of his early meetings with Barry, Barry told him that he was bribing Collins.[177]  He was sure that this did not happen at the first meeting.[178]  Seconds later, he was sure that it was either the first or second meeting.[179]  Later, he thought that it was after a conuple of meetings.[180]

In mid-June 1996, at his first meeting with federal agents, Graham said that he and Barry discussed the bribes at their first meeting.[181]  At a meeting with agents in early

---

[174]Graham, dkt. 178, tr. at 35.

[175]Graham, dkt. 179, at 44.

[176]*Id.* at 30.

[177]*Id.* at 29.

[178]Graham, dkt. 277, tr. at 9.

[179]*Id.*

[180]Graham, dkt. 179, at 29.

[181]Graham, dkt. 277, tr. at 9.

August 1997, Graham said that he and Barry did not discuss the bribes until they started working together.[182]

During his deposition, however, Graham said that, at the first meeting, neither Collins nor Barry said anything illegal or improper; they only talked about the product and how it was made, transported, and stored.[183]

C.    *Method.*

On direct, Graham said that Barry had told him that he was paying Collins in cash to avoid raising suspicions and that Collins was receiving a flat $10,000 each month.[184] He said that Barry had asked him for help in setting up a corporation for Collins so that VitaPro could treat those payments as a business expense, making them tax-deductible. In one of his debriefings, however, Graham said that he helped Collins set up the corporation for Collins's use once he retired from the agency.[185]

Graham also told agents that Barry was wiring money to Collins through an off-shore account.[186]   Barry "made allusions" that he was doing this.[187]   This supported Graham's contention that Barry "was fluent in wire transfers."[188]   Graham said that he saw wire transfers from November and December.[189]   After some pressing by defense counsel, Graham admitted that he was only speculating, that he *never* saw Barry give Collins cash, and that he *never* saw evidence of the transfers.

---

[182]Graham, dkt. 277, tr. at 11.

[183]Graham, dkt. 277, tr. at 10–11.

[184]Graham, dkt. 178, tr. at 25, 21.

[185]Graham, dkt. 179, tr. at 10, 27.

[186]Graham, dkt. 277, at 12–13.

[187]Graham, dkt. 277, tr. at 12.

[188]*Id.* at 13.

[189]*Id.* at 14.

In a mid-June 1997 debriefing, Graham told agents that the bribes came in the form of commissions on VitaPro sold in Texas.[190]  Early on, Graham said that Collins received a four- to five-percent commission.  Later, Graham said that Collins received six to seven percent.  On cross examination, Graham said that this was not exactly what he had told agents.  He said that he had told them that Collins received a $10,000 advance each month against commissions that he would receive.

In 1995, VitaPro sold more than $3,000,000 of product to the agency in 1995.  Six percent of $3,000,000 is $180,000.  Graham said that Barry took money out of his corporation and converted it to cash to send to Collins.  Graham was not able to explain why the agents could not find evidence of these transactions.[191]  What he did reveal is that "I wanted to blow up the amount or the more people. . . " to improve his position with prosecutors.[192]

D.      *Others.*

Graham accused other agency officials of bribery.  He said that Barry bribed Wayne Scott with cash and that Scott would get the cash when he visited Montreal.  He also said that Barry was paying for Scott's travel to Canada.[193]  At the time of trial, Scott had never been to Canada.

At the mid-June 1997 debriefing, Graham said that he "witnessed firsthand" that Collins and Scott were receiving "payments and perks and gratuities and favors and things like that."[194]  When challenged, Graham said that he only saw Scott have a lavish meal in a restaurant, paid for by a company that did business with the agency.   The

---

[190]*Id.* at 15.

[191]*Id.* at 18.

[192]*Id.* at 19.

[193]Graham, dkt. 277, tr. at 20.

[194]*Id.*

company was not VitaPro.[195]  Graham later said that Scott never told him nor had he seen Scott taking bribes of any kind.[196]

Also at the mid-June debriefing, Graham said that Scott participated in pushing the contract through the agency and that Collins handpicked Scott as his successor.[197] He said that Collins wanted to stay at the agency long enough to make sure that Scott would continue the VitaPro contracts.[198]  Graham even said that Graham participated in selecting Scott.[199]  Graham could not explain why Scott cancelled the VitaPro contract as soon as he became the official executive director in January 1996.[200]

Graham also told agents that Barry was giving Larry Kyle money so that Kyle would force Janie Thomas to use VitaPro.[201]   Graham could not explain why the government did not charge Kyle in this case.  Graham also said that Charles Terrell – former chairman of the prison board – was taking bribes.  He accused officials in the New York and Georgia prison systems of similar corruption.[202]  He said all of these things – said them under oath – and more.

19.    *Non-Weight.*

The rules require the court to examine Graham's testimony without weighing it. He is a perfect example of an evaluation that does not involve the traditional appraisal of a witness's credibility.  If two people tell of having seen the same thing with stories that diverge in their particulars, a question of fact has been generated.  If those stories are all

---

[195]*Id.* at 23.

[196]Graham, dkt. 179, tr. at 3; dkt. 277, tr. at 22.

[197]*Id.* at 24-25.

[198]*Id.*

[199]Graham, dkt. 179, tr. at 4.

[200]*Id.* at 5-6.

[201]*Id.* at 6.

[202]*Id.* at 7–8.

of the evidence, the witnesses' manner and character are a means for estimating whether one or the other is more likely to be telling the truth.

Graham's testimony can be analyzed two ways. First, his story – his facts – can be compared with the known objective data, like wire transfers and invoice dates. Second, his story on a specific point can be compared with what he has said about the same fact. Someone once said that law was what could be boldly asserted and plausibly maintained. It could be true for law, and it could be true for fact, but without the plausibility, neither works. Graham boldly asserts a large number of things, but none is plausible in the face of the known facts.

When a witness testifies that something happened differently from what perfectly clear, third-party documents show, no one weighs. When a witness testifies that something happened and then testifies that something mutually incompatible also happened, no one weighs. His two assertions cancel each other, leaving no evidence. When a witness testifies with serial, contradictory versions of the same datum, no one weighs. Graham cannot create a fact issue by taking opposite sides of the identical fact. Nothing in the record could conceivably supply a basis for accepting one version over another.

Traditionally, a witness's ability to have seen what he says he saw or to recollect it are elements of weighing. Graham's testimony – every version of it – and other evidence cohered on the point that he actually had no idea what happened in most of the events. He did not see or do anything inculpatory, with the exception of the volunteered confessions. He saw no invoice. He sent no letter. He carried no cash. He arranged no persuasion of junior officers. He attended no meeting where anything happened. In some cases, he admitted that he had fabricated the story to make himself look good. His dates and places and events are wrong. Stripped of the stuff he "felt" and invented, Graham simply knew nothing.

If Graham admitted his ignorance, he could not convince the United States Attorney in New Orleans to help him. His next scheme, therefore, was to defraud the federal prosecutor in New Orleans. It worked.

Graham did say that Collins and Barry told him that they were in a corrupt arrangement to unload millions of dollars of VitaPro on the state of Texas. He also said

that Scott and others were part of it.  According to Graham, these men were deeply engaged in this bribery when he came along.  He testified to a number of details, none of them was corroborated by hard evidence, like the cash every month or the November and December invoices.  He knew of no day, place, or person present at any meeting when Collins and Barry told him their secret.  He then made even his assertion of their confessions vanish by admitting that he did not know but felt they were up to evil and that he had embellished it all to get the New Orleans prosecutor hooked.

He swore that they asked him to help, but he could not identify anything that he did to help.  He had his daughter form a company for Collins and open a bank account.  He had his wife open a post-office box for Collins's company with Graham's address as back-up and with Graham as a principal.  He could not explain how a post-office box in Kingwood – to which Collins never had access – helped a plan that Graham swore involved either (a) offshore wire transfers or (b) cash payments.  Interestingly, all of "Collin's" acts involve Graham and his family.  Each act, if they are assumed to be the acts of Collins, have an explanation more consistent with innocence than guilt.  Significantly, after Graham got Collins fired, everything that was done after mid-September was done by his public misrepresentations about the timing of Collins's work for the Louisiana project.

Collins's reliance on others for details may have served him well with the staff at the prison, but with Graham, he was used.  When Graham was not testifying to his version *du jour* – rather *du minute* – of facts, he was testifying to meanings and conclusions.  Graham's opinion about what the facts mean is not evidence.  Graham's testimony "dissolve[d] every statement of fact into a declaration of purpose."[203]

This is different from saying that Graham is not credible.  On a motion for acquittal, this court may not evaluate witnesses' believability.[204]  Graham's testimony is not useless because of his multifaceted character flaws, his perjury, or his having sold his testimony to the government.  It is useless because it is has no foundation: Graham knew nothing.  He saw, heard, and did nothing – at least nothing he did not see and hear

---

[203]Hannah Arendt, *The Origins of Totalitarianism*, 385 (1973).

[204]Wright, Fed. Practice and Procedure: Criminal 3d § 467 (2000).

differently from moment to moment.  His testimony was devoid of detail from which to draw reasonable inferences that favor the verdict.[205]  When he did give details, he contradicted his other testimony – even his testimony from seconds earlier.

Graham has no idea what Collins did in the prison – legally or illegally – to push the contract.  Graham did nothing to push it.  Graham only swore that he "felt" that he knew that Collins was acting illegally.  His interpretation is not evidence; suppositions are not facts.  Graham could not say when Barry told him about the bribery.  He could not even estimate how many times he had met with Barry.  He gave contradictory accounts on how the supposed bribery occurred – whether by cash or through an off-shore account, wires, or commissions.  He contradicted himself on how much Barry supposedly had paid or was to pay Collins.  When the record did not support any one of his many theories of payment, he could not explain.

Graham gave conflicting reasons for how and why the corporation was formed.  He, however, prepared no invoices, filed nothing with the state, and never saw a corporate book.  His only involvement with Certified Technology was his receipt of money from it when he was not entitled to it.

For these reasons, the court disregards Graham's testimony completely.  More correctly, the court has carefully regarded Graham's testimony:  "There is no there, there."[206]  Without its ephemera, the record has no evidence of a connection between the agency's use of VitaPro and the five-year contract and the one purposeful wire transfer.  There is no reasonable basis to let the convictions remain.

20.   *Bribery*.

On the bribery counts, the government must have proved beyond a reasonable doubt that Collins corruptly accepted something of value from Barry for Collins's getting VitaPro into Texas prisons.[207]   It must have proved that Barry corruptly solicited

---

[205]*United States v. John Pennington, et al.*, 20 F.3d 593, 597 (5th Cir. 1994); *United States v. Robertson*, 110 F.3d 1113, 1117 (5th Cir. 1997).

[206]Gertrude Stein, *Everybody's Autobiography* 289 (1937) .

[207]18 U.S.C. § 666(a)(1)(B).

Collins.[208]  The value of the VitaPro contract must have exceeded $5,000.  It did.  In addition, the agency must receive more than $10,000 a year in federal funds.  It does. [209] The government does not have to prove that the bribes affected programs covered by those federal funds.[210]

The critical issue is whether Collins took payment in exchange for pushing the contract within the agency.[211]  Barry must have paid him corruptly, and Collins must have received the payment corruptly.  "Corrupt" means tainted, immoral, or wrong.[212] The government may prove its case through circumstantial and direct evidence.  Here, the government did not prove beyond a reasonable doubt the existence of a corrupt agreement between Collins and Barry, and the bribery counts – counts two through five of the indictment – will be dismissed.

A.      *Testimony*.

With the exception of Graham, Lero, and an expert, the entirety of the government's witnesses  came from the agency.  They said only that Collins wanted the prisons to use VitaPro frequently and that he was extremely involved with the agency's contract with the company.  None objected to VitaPro's use.  The initial approval of VitaPro, in fact, was by others who went to Montreal without Collins.  None testified about an agreement between Collins and Barry; of the witnesses who were asked, none knew about an agreement or payment.  Without an agreement, the government cannot prove that bribery occurred.

The only witness claiming to have direct knowledge of an agreement between Collins and Barry was Graham, who felt that there must have been a deal.  He was projecting his venality on them.  The court is left, therefore, with a series of witnesses

---

[208]18 U.S.C. § 666(a)(2).

[209]18 U.S.C. § 666(b); Exs. 28, 29, 30.

[210]*Mario Salinas v. United States*, 522 U.S. 52 (1997).

[211]*United States v. Tomblin*, 46 F.3d 1369, 1379 (5th Cir. 1995).

[212]*Arthur Andersen, L.L.P. v. United States*, 125 S.Ct. 2129, 2136 (2005); WEBSTER'S DICTIONARY 294 (9th ed. 1983).

who, in the aggregate, spoke at worst of Collins's enthusiasm for VitaPro.  Absent more, their testimony is not enough to sustain the convictions.

 B.  *Transfers.*

Counts two and four are based on the wire transfer that occurred on December 7.  This was the transfer that Barry authorized and that Collins expected.  Their view of  it is – unsurprisingly – different than the government's.  According to Collins and Barry, the transfer of $10,000 was Collins's advance for consulting work that he would begin in January 1996.  In addition, Barry thought that Collins's last day with the agency was on November 30; a transfer a week later would have been in the clear.  Barry did not know that Collins had moved his last day to the end of December; there is no evidence that he did.

In addition, the agency began its use of VitaPro in November 1994.  It finalized the five-year contract in September 1995.  Collins retired at the end of 1995.  If Barry had wanted to bribe Collins, he would have done so while Collins was in a position to influence the agency – not when he was a lame duck.  The government does not surmount this hurdle.  It offered Graham's testimony that Collins's was "babysitting" the project, but as the court learned, Graham had no idea what he meant when he said that.

Counts three and five are based on the wire transfer on December 8th.  The government says that this was the second installment of the bribe.  The bank, however, transferred the money in error.  Since Barry did not authorize the transfer, he could have had no intent to bribe Collins, and Collins had no intent to accept the money.  Counts three and five are dismissed for the additional reason that a foundational element of bribery – intent – did not exist.  No bribery could have occurred.

When the bank completed its audit in early *March*, Barry told it to let the transfer stand because he owed Collins money for his work.  The government says that this was still bribery.  It is wrong because:

 • Collins had done work for VitaPro after he left the state job.

 • By this time, the Texas agency had rescinded the VitaPro contract and was involved in litigation with Barry.  The bribery statute contemplates a reward; rescission of a contract and litigation are not rewards.

- •   Collins was no longer with the agency.  The bribery payment must be to an official;  Collins was a private consultant.

C.   *Theories.*

Collins agrees that he advocated the use of VitaPro in the prisons.  Collins and Barry agree that Barry paid Collins $10,000 in December.  They do not dispute that Collins went to work for VitaPro after he retired from the agency.  They view these events as unconnected.  The evidence supports them.  But for Graham's project in Louisiana, Collins would not have lost his job.  But for Graham's contradictory testimony, the defendants never would have been indicted and convicted.

The defendants have offered a plausible account of their innocence.  Their theory is comparable – if not superior – to the government's theory of guilt.  The government, therefore, has not proved its case beyond a reasonable doubt, and the court must reverse the convictions.[213]

21.   *Money Laundering.*

The government must have proved beyond a reasonable doubt that Collins and Barry engaged in the wire transfers with the intent to conceal the nature of the proceeds of specified unlawful activity – the bribery.[214]  The government says that the funds transferred on December 7th and 8th were laundered money.  It is wrong.

Even if the evidence established that the men engaged in bribery, it cannot establish that they laundered money.   Money laundering is separate from the specified unlawful activity.  It occurs only after the crime from which the funds were obtained is complete.[215]  Under the government's theory, the transfers are the proceeds of the bribes and were designed to conceal those same bribes.   This is impossible:  the transfers *are* the bribery; they cannot be the laundered funds, too.   Since there was no completed

---

[213]*Pennington*, 20 F.3d at 597.

[214]18 U.S.C. § 1956(a)(1)(B)(i).

[215]*United States v. Kennedy*, 64 F.3d 1465, 1477 (10th Cir. 1995); *United States v. LaBrunerie*, 914 F. Supp. 340 (W.D. Mo. 1995).

offense before the transfers were made, there were no proceeds to clean.  Counts six and seven are, therefore, dismissed.

They are also dismissed because the government did not prove that the specified unlawful activity underlying the laundering – the bribery – occurred.

Last, count seven is dismissed for the additional reason that the bank erred in making the transfer on December 8th.  If Barry did not authorize the wire and Collins was not expecting it, the men had no intent to launder money.

22.     *Conspiracy*.

The conspiracy count of the indictment included all the crimes of which Collins and Barry were charged – bribery, money laundering, and social-security fraud.  The court entered an acquittal on the social-security count during trial, leaving only the bribery and money-laundering counts.

The evidence supports no reasonable inference that the defendants conspired to commit bribery and launder money.  They did a few things in parallel but nothing in exchange for official acts.   The court, therefore, acquits them of their conspiracy conviction, too.

23.     *New Trial*.

If the acquittal does not subsist, this court will give the defendants a new trial.[216] The defendants' motion for a new trial is timely for the reasons that their motion for acquittal is timely.

---

[216]Fed. R. Crim. P. 29(d).

The evidence is contrary to the great weight of evidence.[217]  A serious miscarriage of justice would result if the convictions remained.[218]  This court vacates the convictions and gives the defendants a new trial because justice requires.[219]

A.      *Credibility.*

Unlike a motion for acquittal, on a motion for a new trial, the court *may* weigh the evidence and evaluate witnesses' credibility.[220]  With this latitude, then, the court finds that Graham was totally unbelievable.  He is a felon, a thief, a cheat, and a liar.  He perjured himself throughout his testimony.  Graham told the government that he had information on Collins and Barry – when he clearly knew nothing – to improve his position.  His testimony about the corporation and the invoices even contradicted that of his own daughter, with whom he claimed to have worked closely.

Daniel McNaulty, an investigator with the public integrity division of the Harris County District Attorney's Office, has investigated Graham three times.[221]  McNaulty testified that Graham does not "tell the truth unless you can prove that he is telling the truth."[222]  His reputation among those who know him best is "that he is a thief and that he is dishonest and that he is not truthful."[223]  James Gray is a lawyer whose client had a business dispute with Graham.  Gray investigated the nature of Graham's businesses;

---

[217]*United States v. Huera-Orozco*, 272 F.3d 561, 567 (8th Cir. 2001).

[218]Wright, King & Klein, Federal Practice and Procedure: Criminal 3d § 553 (2004); *United States v. Lincoln*, 630 F.2d 1313, 1319 (8th Cir. 1980); *Robertson*, 110 F.3d at 1118.

[219]Fed. R. Crim. P. 33(a).

[220]*Robertson*, 110 F.3d at 1117.

[221]Depo. of Daniel McNaulty, dkt. 281, tr. at 61.

[222]*Id.* at 62.

[223]*Id.*

he could find nothing legitimate about them.[224]  He described Graham's reputation as "horrible" and that he "wouldn't believe anything he said."[225]

Graham's credibility casts the government's theory about the wire transfers into serious doubt.  Without his testimony, there is no connection between the agency's five-year contract with VitaPro and the wire transfers to Collins.  Graham knew nothing about a deal.  He saw no invoices, until agents showed them to him.  He knew nothing about wire transfers, until agents told him about them.  He even lied about other Texas officials' involvement in the VitaPro contract.

Graham fabricated his knowledge to impress the government.  He admitted, "I wanted to blow up the amount or the more people. . . ."  Apparently, the government – or rather one United States Attorney – found him useful enough to give him substantial assistance in reducing his punishment for numerous crimes.  One wonders if Graham's testimony in other trials was similarly perjurious and whether wrongful convictions also followed.  One also wonders why the government has not indicted Graham for perjury in this case, but then again, he did strike a mysteriously good deal with Jim Letten.

Graham's defective character, crimes, and motivation in testifying against Collins and Barry make him totally unbelievable.  In addition, his testimony was the only incriminating evidence that the government offered.  He lied about what he knew; the government does not contest this.  It says only that it is too late for the court to fix things.  It is wrong.

The government knew or should have known that Graham was lying; his deceit was manifest.  But for Graham's perjured testimony, it is unlikely that the jury would have convicted the defendants.  Because his testimony was material to the conviction, the defendants will receive a new trial.[226]

---

[224]Depo. of James Gray, dkt. 281, tr. at 70–71.

[225]*Id.*

[226]*United States v. Wallach*, 935 F.2d 445 (2d. Cir. 1991).

B.     *Confusion.*

In addition, irrelevant evidence confused the jury.  This included transactions besides the December wire transfers, testimony about the social-security charge, Collins's post-retirement plans, and Graham's selling VitaPro.

1.     *Transactions.*

The money-laundering counts of the indictment were based solely on the transfers of December 7th and 8th.  The government, however, introduced evidence of other transactions.[227]  These included checks and cash that Collins deposited into his personal checking account and checks that he wrote in the process of buying his home.  The government's expert testified about deposits and withdrawals on the Certified Technology bank account that occurred from November 1995 to the end of June 1996 – way beyond the temporal scope of the charged transactions.

With the exception of the wire transfers, at no time did the government connect these transactions to the bribery or money-laundering counts.  It simply hoped that the mention of them would impugn Collins and Barry in the eyes of the jury.  Apparently, it did.  The government, however, must do more than prove its case by suspicion and innuendo.

2.     *Social Security.*

The government had charged Collins and Barry with social-security fraud because of a badge that Collins helped Barry obtain.  The badge was regularly issued to vendors who did business with the prison so that they could enter the prison without going through security when they made deliveries.  The number on the badge was the vendor's United States social-security number.  Barry is Canadian; he does not have a United States social-security number.

Collins arranged for Barry to get a badge.  The prison staff had no success using his Canadian number in the computer system.  The staff, therefore, devised a number to enter into the system.  It worked, and Barry got his badge – and ultimately an indictment for social-security fraud.

---

[227]Ex. 76; Depo. of Ron Emmert, dkt. 278, at 49–64.

Use of the fake number did not defraud the Social Security Commission; it was a way of circumventing the computer system. The worst that can be said of the agency's practice is that it was a potential security violation, not that it was illegal. The government presented no evidence to show that Barry represented that the number was issued to him by the Social Security Commission. The court, therefore, acquitted them of the count during trial.[228]

Jurors, however, considered evidence of the dismissed charge in their deliberations. They asked to see a transcript of the direct testimony of the two witnesses who testified about the charge.[229] They wanted to hear those witnesses' testimonies about the date when the agency made the badge for Barry.[230] The dismissed charge was no longer relevant as an independent charge or as a component of the conspiracy. Regardless, the juror notes to the court suggest that the jurors still deliberated on it.

3. *Post-Retirement.*

This trial was about whether Barry gave Collins money and Collins took it in exchange for the agency's five-year contract with VitaPro. Regardless, the government repeatedly talked about Collins's plans after he retired. For example, the government insinuated that Collins's participation in the Louisiana prison project as a conflict of interest.[231] The project, however, was only chronologically significant: it explained why and when Collins left the agency. It had absolutely no bearing on whether Barry and Collins engaged in bribery, money laundering, or conspiracy to commit those crimes.

It certainly did not help the defendants that the project involved Patrick Graham – something that no doubt impugned Collins in the eyes of the jury. Like the project itself, Graham's involvement was irrelevant.

---

[228]Dkts. 180, 181.

[229]Dkt. 202, Juror Note 1.

[230]Dkt. 204, Juror Note 2.

[231]*See, e.g.,* Govt.'s Closing Argument, dkt. 282, at 26–27.

The government also asked former F.B.I. agent Oliver Revell whether it was proper for Collins to work for VitaPro after he retired.[232]  The government never argued that Collins's employment with the company was part of the value that he received in exchange for the agency's five-year VitaPro contract.  Its discussion, therefore, was likewise impertinent to the charges.

4.      *Graham & VitaPro.*

That police found a VitaPro card on Graham when he was arrested in January 1996 no doubt tainted Collins and Barry's defense.  This fact, however, had nothing to do with bribery, money laundering, or conspiracy, nor did the government connect it to the crimes charged.  Graham's possessing the card did nothing to show that they committed the crimes of which they were accused.

5.      *Transcript.*

No substantially verbatim transcript of the trial exists.  The defendants moved for post-verdict relief on the basis of what they received from the chief deputy clerk.  From the tapes that he did have or were audible, the clerk found 798 errors in 941 pages of testimony that he was able to check.[233]  He did not have back-up audio tapes for 356 pages of trial testimony. This error rate is substantial.

The defendants needed a reliable transcript to support their arguments about the sufficiency and weight of the evidence in their post-verdict motions.  Despite the clerk's tireless efforts to reconstruct the transcript, by no fault of his own, flaws remain.  Because this most fundamental component of the trial process was flawed, the defendants will receive a new trial.

The cumulative effect of Graham's perjury, the jury's confusion about the badge, the social-security count, and Collins's post-retirement plans, and Graham's taint was the defendants' convictions.  In addition, the defendants had no reliable record of their trial with which to support their post-verdict papers.  For these reasons, they conditionally will receive a new trial.

---

[232]Revell, dkt. 279, at 23–26.

[233]Dkt. 291 at 5.

24.     *Conclusion.*

The government did not prove its case beyond a reasonable doubt.  Its witnesses from the agency testified only that Collins strongly advocated VitaPro's use.  None testified – or knew – about an illegal deal between the defendants.  The only witness who said that he knew about a deal was Patrick Graham.  Because he contradicted himself throughout his two days of testimony, his testimony cancels itself.

The court, therefore, has evidence only that : Collins really wanted his agency to use VitaPro; he went to work for VitaPro when he retired from the agency; Barry gave him an advance;  and Barry let stand an erroneous transfer to Collins because, by the time that the bank confirmed the error, Barry owed Collins money.  These events do not prove bribery, money laundering, or even conspiracy.  Because the evidence is insufficient to support the men's convictions, Collins and Barry will be acquitted.

Contingently, the defendants will receive a new trial.  Justice requires it.  The only inculpatory evidence was the testimony of Patrick Graham – a fraud.  He testified only to get the government's help in reducing his punishment for other crimes.  Graham claimed knowledge that he did not have about facts that never existed.

Last, the government presented evidence that it did not tether to the charges.  The evidence was irrelevant, but it sufficiently confused the jury, prejudiced the defendants, and likely contributed to their convictions.


Signed September  8, 2005, at Houston, Texas.


Lynn N. Hughes
United States District Judge